913 So.2d 339 (2005)
Teresa L. PARKER, Appellant
v.
Timothy Robin SOUTH, Appellee.
No. 2004-CA-00352-COA.
Court of Appeals of Mississippi.
April 12, 2005.
*341 A. Rhett Wise, Jackson, attorney for appellant.
J. Mark Shelton, Jana Dawson, Tupelo, attorneys for appellee.
Before BRIDGES, P.J., IRVING and MYERS, JJ.
MYERS, J., for the Court.
¶ 1. On September 29, 2000, an agreed order for adjudication of paternity and establishment of visitation rights was entered by the Chancery Court of Pontotoc County. Pursuant to this agreed order, Tim South, the appellee, was adjudicated to be the father of Christopher Wyatt Parker ("Wyatt"), a minor child who was born on December 13, 1994. Wyatt's mother is Teresa Parker, the appellant. On July 22, 2002, South filed a motion for modification of the agreed order for adjudication of paternity, which he mistakenly denominated as a "Complaint for Modification of Final Decree of Divorce, Temporary Emergency Custody and Citation for Contempt of Court and Other Relief." Since South and Parker were never married to one another, the reference to a decree of *342 divorce in the complaint he filed was an oversight or mistake of the drafter. In any event, the parties do not dispute that, through this complaint, South was seeking a modification of the September 29, 2000 agreed order for adjudication of paternity.
¶ 2. On December 29, 2003, the chancellor granted South's motion for modification and awarded South primary physical custody of Wyatt. The chancellor also granted visitation rights to Parker and ordered her to pay child support in the amount of $40 per week or $172 per month. Aggrieved by the judgment of the chancery court, Parker now appeals, raising the following two issues:
I. DID THE CHANCELLOR ERR IN FINDING THAT THERE WAS SUFFICIENT PROOF OF A SUBSTANTIAL AND MATERIAL CHANGE IN CIRCUMSTANCES THAT ADVERSELY AFFECTED THE CHILD'S WELFARE?
II. DID THE CHANCELLOR'S DECISION GO AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 3. Finding no reversible error, we affirm the chancellor's judgment.

FACTS
¶ 4. Sometime after being adjudicated to be the father of Wyatt, South began to be disturbed by certain behavior of Parker and by the environment in which Wyatt was being reared. After a time, South filed for a modification, seeking to have primary physical custody taken away from Parker and awarded to him. Among the circumstances that prompted South to take this action were the following: Parker took actions aimed at harming the relationship between Wyatt and South, including discouraging visitation and refusing to send clothing with Wyatt when he left for visitation with South. Parker changed her residence and moved Wyatt three times between the time of the original agreed order and the filing of the motion for modification. One of these residence changes involved Parker taking Wyatt and her other son, Kyle, to Illinois in order to move in with a man that Parker had known for only four months and to whom Parker was not married. While in Illinois, Parker, her boyfriend, and her children lived in a one bedroom apartment, in which the children slept on the couch or on an air mattress on the floor while Parker and her boyfriend slept together in the bedroom. Also while in Illinois, Parker took her two children to a bar parking lot from around 8:00 p.m. to 11:00 p.m. in order to listen to her boyfriend's band play inside the bar. Wyatt was roughly six years old at the time of the move to Illinois.
¶ 5. After three months in Illinois, Parker left her boyfriend and moved back to Mississippi. During the entire period while in Illinois and for approximately five months after returning to Mississippi, Parker was unemployed. In addition, in March of 2002, Parker was convicted of driving under the influence, as she was driving home from a night out at a bar. Also, while in Parker's care, Wyatt was the victim of some kind of inappropriate physical touching by a slightly older, male cousin, who lives next door to Parker, and Parker took little action in response to this incident, even doubting for a time the veracity of Wyatt and the other boy's story. Also, a relatively short time after returning to Mississippi, Parker moved herself, Wyatt, and her other son in with another man to whom she was not married. She met this man at a bar, and at the time when they commenced their relationship, he was married. He became divorced, and he and Parker finally became engaged after South filed his motion for *343 modification; but as of the time of the entry of the chancellor's judgment, Parker and her fiance were not married and no wedding date had been set. There was evidence that this most recent boyfriend, currently Parker's fiancé, drove Wyatt to and from a soccer game while under the influence of alcohol, and there was other evidence of alcohol use in the home by Parker and her fiancé. In addition, on one occasion in the presence of the children, Parker's fiancé verbally accosted South when South had come to pick up Wyatt for visitation. This incident involved some yelling and cursing by both parties and culminated in Parker hitting and slapping South, all while Wyatt watched.
¶ 6. Also, the father of Parker's other son, Kyle, was another man earlier in the string of Parker's relationships. It was further shown that Wyatt and Kyle understand the nature of the relationships between Parker and her boyfriends, as Parker and her boyfriends have typically slept in the same room and displayed affection in front of the children. Finally, in spite of all of these circumstances, Parker maintains that she sees "nothing wrong" with her personal or parenting choices.
¶ 7. As the proceeding below developed, a contrast, that was apparently not lost to the chancellor, between Parker and South emerged. South is current in his child support obligations, and he did not miss any of his visitation times, including the three month period during which Parker lived in Illinois. During that time, South drove to Illinois for his visitation weekends. In addition, South has been married to the same woman for eight years, and they have two children born during this marriage. Although he had been consistently employed for the entire time after the entry of the agreed order, South was laid off from his job at the time of the trial. This was due to an injury he suffered on the job that subsequently prevented him from performing the duties of this job. Thus, his temporary unemployment was shown to be anomalous, as South has no history of unemployment. Other relevant facts will be brought out in the remainder of this opinion.

LEGAL ANALYSIS
I. DID THE CHANCELLOR ERR IN FINDING THAT THERE WAS SUFFICIENT PROOF OF A SUBSTANTIAL AND MATERIAL CHANGE IN CIRCUMSTANCES THAT ADVERSELY AFFECTED THE CHILD'S WELFARE?
¶ 8. Parker argues that there was not sufficient proof of a substantial and material change in circumstances that adversely affected the child's welfare, as required before a modification can be granted. South argues that the proof was sufficient and that the modification was proper.

STANDARD OF REVIEW
¶ 9. Our standard of review of a chancellor's decision in a child custody case has been stated as follows:
The standard of review in child custody cases is narrow. Reversal of a chancellor's judgment requires that the chancellor be manifestly wrong or have "applied an erroneous legal standard." Lee v. Lee, 798 So.2d 1284, 1288 (Miss.2001) (citing Williams v. Williams, 656 So.2d 325, 330 (Miss.1995)). An appellate court is to affirm findings of fact by chancellors in domestic cases when they are "supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996). It is the role of the chancellor to ascertain whether witnesses and evidence are *344 credible and the weight to give each. Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss.1994).
Robison v. Lanford, 841 So.2d 1119, 1122(¶ 9) (Miss.2003). As this quote demonstrates, our standard of review in this kind of case is very limited. Yet, as an overarching guideline in our review of child custody cases, the Robison court added, "Let us remember, it is the responsibility of this Court, like the chancellor, to make the best interest of the child our `polestar' consideration." Id. (citing Hensarling v. Hensarling, 824 So.2d 583, 587(¶ 8) (Miss.2002)).

DISCUSSION
¶ 10. The decision whether to grant a modification of child custody has been said to involve a two step analysis. The Robison case frames that analysis as follows, "In proceedings to modify custody, `the prerequisites [are] (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody.'" Robison, 841 So.2d at 1124(¶ 16) (quoting Brocato v. Brocato, 731 So.2d 1138, 1141(¶ 9) (Miss.1999)). Yet, other decisions have split the first step of the analysis into two steps, thus making the decision whether to grant a modification to involve a three step analysis. An example of this is the case of Mabus v. Mabus, 847 So.2d 815 (Miss.2003). There the court declared, "In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody." Id. at 818, (¶ 8) (citing Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992)). The three step analysis may be somewhat neater analytically, but the elements are ultimately the same, whether they are analyzed as two or three separate elements. In this opinion, we will use the three step analysis and, thus, employ our limited standard of review to determine if the chancellor committed manifest error in finding (1) that there was a material change in circumstances, (2) that this change adversely affected the child, and (3) that a modification was in the best interests of the child.

(1) Material change in circumstances
¶ 11. As noted above in the statement of facts, South pointed to various facts arising after the entry of the agreed order adjudicating paternity, and he argued that these facts showed a material change in circumstances that was adverse to the best interest of his minor child. To restate some of what was noted in the facts above, among other things in addition to the fact of Parker's cohabitation with two different men since the entry of the agreed order of paternity, South also tried to show that Parker and her fiance's alcohol consumption was a problem, pointing to Parker's conviction for DUI in March of 2002 and her fiance's inappropriate use of alcohol around Wyatt. On the subject of alcohol use, South testified that Parker's fiancé drove Wyatt to and from one of Wyatt's soccer games while under the influence of alcohol and that Parker's fiancé was visibly under the influence of alcohol on some occasions when South picked Wyatt up for visitation.
¶ 12. South also argued the following: that Parker mishandled the inappropriate touching incident with Wyatt's cousin; that Parker has attempted to undermine the relationship between Wyatt and South; that Parker inappropriately took the children to a bar late at night while in Illinois; that Parker's fiancé verbally accosted South in front of Wyatt on one occasion as *345 South was attempting to pick Wyatt up for visitation; and that at this same incident Parker slapped and hit South in front of Wyatt.
¶ 13. Parker makes some attempt to explain or justify these facts and circumstances, but on the whole, Parker's own testimony corroborated these facts. Thus Parker, in the end, is left arguing, in essence, that although all of these things happened, the chancellor nonetheless erred in finding that there was a material change in circumstances. We disagree.
¶ 14. In light of the facts recited above, we cannot say that the chancellor committed manifest error in finding that there was a material change in circumstances. As previously stated, our review of the record reveals that the above facts were established by South's testimony and largely corroborated by Parker's testimony. Those parts that were not corroborated by Parker's testimony remained uncontradicted throughout the trial. In addition, it is clear from the record that all of the above circumstances occurred after the entry of the agreed order adjudicating paternity.
¶ 15. Therefore, we find no manifest error in the chancellor's finding of a material change in circumstances. Having made this conclusion, we must now examine the chancellor's finding that this material change had an adverse affect upon the child.

(2) Adverse affect upon the child
¶ 16. We note at the outset that the facts outlined above, which were found to constitute a material change in circumstances, when taken as a whole appear to us to bear within themselves the proof of this second element. Thus, given these facts, at first glance there appears to be no clear or manifest error in the chancellor's finding that this material change in circumstances adversely affected the child. We will, nevertheless, examine the chancellor's finding in more detail.
¶ 17. It will be helpful to note briefly in this regard how Parker attempted to show that the child was not adversely affected. Parker tried to make much of the fact that Wyatt was not physically malnourished or neglected in basic material ways regarding food, clothing, education, and the like, and Parker contended that, overall, South was merely worried about the affect Parker's conduct might have on Wyatt in the future. Parker contended that worry about possible adverse affects in the future was not sufficient to justify a change in custody, because the modification inquiry requires the party seeking the modification to prove that the child has already been adversely affected.
¶ 18. While this argument may have some technical merit if viewed outside of the facts of the present case, when viewed in light of the facts of this case, the argument lacks merit. Very simply, the record does not bear out that the chancellor ordered the custody change based upon what he feared might happen to the minor child. (Although we must admit that, if the circumstances were compelling enough, we do not see why a chancellor could not order a custody change for the child's own protection, if such a change would be in the best interests of the child). The chancellor ultimately found that the minor child had been repeatedly placed in dangerous and/or inappropriate situations while in the physical custody of his mother and that this had, indeed, already adversely affected the minor child.
¶ 19. We can find no manifest error in this conclusion. Contrary to Parker's assertions, we do not find our law to say that just because a child has not been deprived of basic food, clothing, and shelter, that *346 therefore he or she can not have been adversely affected by other changed circumstances. As the Albright factors themselves demonstrate, our courts are to consider things such as the emotions of the child and the moral fitness of the parents. Thus, while we are not yet to the point of considering the Albright factors specifically, in this opinion, the content of several of the Albright factors demonstrates that our law on child custody matters takes into account many things in addition to the basic physical needs of the child.

(3) The child's best interests
¶ 20. The last part in the modification inquiry asks, given a material change in circumstances that adversely effects the child, whether a modification would be in the child's best interest. At this point, however, we must digress to consider another argument that Parker raises, namely that the chancellor inappropriately based his decision on the primary ground of moral condemnation of Parker's lifestyle choices. As with other arguments made by Parker, this argument may have some technical merit when viewed outside of the facts of this case, but, given the facts of this case, this argument also lacks merit.
¶ 21. If, for instance, the only thing that South had shown at trial was that Parker was cohabitating with her fiance, then that by itself would probably not have been a material change in circumstances that was adverse to the child under the rule announced in the case of Cheek v. Ricker, 431 So.2d 1139, 1144-45 n. 3-4 (Miss.1983), and more recently, Hollon v. Hollon, 784 So.2d 943, 949(¶ 25) (Miss. 2001). Both of those cases stand for the proposition that mere "sexual misconduct" (such as unmarried cohabitation) alone, without any showing of an adverse effect upon the child will not justify a change in custody. Id. The record in this case, however, presents facts going far beyond "mere" unmarried cohabitation with no other attendant circumstances and with no indication of an adverse affect upon the child. In this case, as previously noted, there was the matter of Parker's taking Wyatt to a bar late at night in Illinois, the move to Illinois itself and its attendant circumstances, including the exposing of Wyatt to a man Parker had only known for a very short time, Parker's conviction of driving under the influence, Parker's periods of unemployment, and the somewhat precipitous commencement of cohabitation with another man after returning from Illinois. In addition, questions have been raised about the conduct and character of Parker's current live-in fiancé, particularly in regards to his alcohol use. Thus, there is more to this case than "mere" unmarried cohabitation or "sexual misconduct," although that issue may be prevalent.
¶ 22. In this regard, a telling refrain emerges from Parker's appellate brief. She refers at several points to what she calls "an `isolated incident' insufficient to justify a change of custody,'" citing as support for this proposition the case of Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss.1984). Yet, throughout the course of her brief, she specifically refers to at least three different, separate incidents all as "isolated." For instance, within a page of the first occurrence of the refrain, which first appeared after the discussion of the confrontation where South was accosted by Parker and Parker's boyfriend when South picked up Wyatt for visitation one weekend, she refers again to another, different "isolated incident," this time involving Parker's boyfriend driving Wyatt to and from a soccer game while under the influence of alcohol. Previous to these two occurrences of the "isolated incident" refrain, she had discussed no less than four other different incidents, and after mentioning a total now of no less than six separate *347 incidents, she goes on to discuss at least two more incidents, including her conviction for driving under the influence, which, she argues, should also be considered "isolated incidents."
¶ 23. We find this argument from Tucker to be specious, at best. While we do not state, as a matter of law, how many separate incidents within a relatively short amount of time have to occur before the rule of Tucker no longer applies, we do state, with some confidence, that eight separate incidents, occurring at different times, do not constitute one single isolated incident. We also note that eight is the minimum number of incidents apparent from Parker's brief; South's brief points out some additional incidents, which have been discussed elsewhere in this opinion. Contrary to Parker's arguments, the case sub judice is not one in which a single, isolated occurrence has been used to justify a change in custody, nor is the case sub judice one in which a few random, unrelated events have been improperly stretched in an attempt to find a material change in the overall living conditions of the custodial parent. On the contrary, in the present case there have been numerous incidents, united by common, recurring themes, (misuse of alcohol and sexual misconduct being the two most obvious themes tying these incidents together) such that the chancellor was justified in recognizing a problem in the overall living conditions of the custodial parent. Therefore, the isolated incident rule, as stated in Tucker, is inapplicable to the case sub judice.
¶ 24. That somewhat lengthy digression brings us back to the point of this subsection: the best interests of the child. We find that the chancellor's decision was supported by substantial evidence and that there was no manifest or clear error in this decision. We have already found that the chancellor was not in error in finding (1) a material change in circumstances and (2) that this material change adversely affected the child, and we have already noted above the contrast between South and Parker's conduct and living arrangements. Based upon our review of the record, we can not say that the chancellor committed manifest error in finding that there was a material change in circumstances that adversely affected the child, such that a modification was in the child's best interests.
II. DID THE CHANCELLOR'S DECISION GO AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 25. Parker argues that the chancellor's decision went against the overwhelming weight of the evidence. In particular, Parker argues that the chancellor improperly considered and applied the Albright factors. South argues that the chancellor's decision was supported by the weight of the evidence and that the chancellor correctly considered and applied the Albright factors.

STANDARD OF REVIEW
¶ 26. Our standard of review for this issue is the same as for the first issue, discussed above. Robison, 841 So.2d at 1122(¶ 9). Regarding challenges to a chancellor's application of the Albright factors, in particular, however, we have held, "[A]n appellate court must find a chancellor in error where the chancellor improperly considers and applies the Albright factors." Watts v. Watts, 854 So.2d 11, 13(¶ 5) (Miss.Ct.App.2003). We have held further that "[i]n order to determine whether or not the chancellor was manifestly wrong, clearly erroneous or abused his discretion in applying the Albright factors, we review the evidence and testimony presented at trial under each factor to ensure his ruling was supported by record." Hollon, 784 So.2d at 947(¶ 13).

*348 DISCUSSION
¶ 27. Thus, pursuant to our standard of review, we will discuss each of the Albright factors in turn. Although they are by now familiar in our law, we will, nevertheless, briefly note whether the chancellor correctly stated which factors make up the Albright factors, before discussing each of them in turn.
¶ 28. The overarching inquiry that the Albright factors are designed to serve is the best interests of the child, and in order to determine the best interests of the child, the court should consider: (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of the parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In reviewing the chancellor's bench ruling and the written judgment, we find that the chancellor accurately stated the above listed Albright factors. We must now examine the chancellor's application of those factors to the present case.

(1) Age, Health and Sex of the Child
¶ 29. The chancellor found this factor to favor South, noting primarily that the minor child is a young male. Implicit in this finding, we believe, is the idea that such a young male will need the guidance and care of his father as he matures, in a similar way that a young female would need the guidance and care of her mother. Based upon our review of the record, we can find no manifest or clear error in this finding.

(2) Continuity of Care
¶ 30. The chancellor found this factor to favor Parker, as she had physical custody of the minor child for the entire time leading up to the filing of the motion for modification. Based upon our review of the record, we can find no manifest or clear error in this finding.

(3) Parenting Skills and Willingness and Capacity to Provide Primary Care
¶ 31. The chancellor found this factor to favor South for several reasons. First, the chancellor noted some very poor parenting choices that Parker had made, including moving her two young sons to Illinois in order to cohabitate with a man she had only known for four months and exposing her two young sons to "late night bar activity" (referring to the incident in Illinois in which Parker took her two sons to a bar from around 8:00 p.m. to 11:00 p.m. to hear her then current boyfriend's band play). In addition, the court specifically remarked upon the testimony and demeanor of South at the trial as supporting his conclusion that this factor favored South. Of course, on appeal we cannot speak to the demeanor of a particular witness at trial, having before us only the written record. But, having reviewed that record, we cannot say that the chancellor committed manifest or clear error in his overall finding on this factor.

(4) Employment of the Parent and Responsibilities of that Employment
¶ 32. The chancellor found this factor to favor both of the parties equally, noting that they both were or had been gainfully *349 employed for the majority of the time relevant to the proceeding and that neither parties' work responsibilities precluded spending time with the minor child. We find the chancellor's finding on this particular issue to be clearly erroneous, because at the time that the judgment was entered South was unemployed. This factor should have favored Parker, as she was employed at the time of the judgment and had been employed with the same employer for almost two years. We do, however, find that the chancellor was not manifestly wrong to lessen the impact of South's unemployment on the overall analysis, given the employment record South had maintained for the previous years and the particular circumstances surrounding his current unemployment.

(5) Physical and Mental Health and Age of the Parents
¶ 33. The chancellor found this factor to favor both of the parties equally, noting that both parties were physically and mentally healthy and of suitable age. Based upon our review of the record, we can find no manifest or clear error in this finding.

(6) Moral Fitness
¶ 34. The chancellor found that this factor clearly favored South, noting the circumstances which we have previously discussed. Primarily, the chancellor focused on Parker's consecutive cohabitation with two different men within a short period of time, and Parker and her current fiance's use and, sometimes, misuse of alcohol. In addition, the chancellor appeared to take note of the fact that Parker declared that she saw nothing wrong with any of this.
¶ 35. The chancellor noted that, in contrast to Parker, South had been married to the same person for the past eight years; that South and his wife did not drink alcoholic beverages or keep any alcohol in their home; that South believed that exposing young, impressionable children to consecutive, unmarried sexual relationships was improper; and that South saw something wrong with taking small children to a bar late at night.
¶ 36. Parker brought out the fact that some years ago South's parental rights in the two children from his first marriage were terminated. But the circumstances involving this previous marriage and the termination of parental rights took place before the times relevant to this action, and in addition South testified during the proffer of this evidence that he regretted this termination "more than anything in the world." The evidence also showed that South now has contact with these two children and that he has cordial relations with his ex-wife. Ultimately, however, the chancellor ruled that all of the circumstances surrounding South's previous marriage and termination of parental rights were too remote in time to bear much relevance to the present action, and the chancellor found that this factor favored South.
¶ 37. Based upon our review of the record, we can find no manifest or clear error in this finding.

(7) Home, School, and Community Record of the Child
¶ 38. The chancellor found this factor to favor Parker, noting that the minor child's grades were above-average and that the mother's involvement with school and community with the child has been excellent. Based upon our review of the record, we can find no manifest or clear error in this finding.

(8) Preference of the Child at the Age Sufficient to Express a Preferences by Law
¶ 39. This factor was not relevant at the time because the minor child was under *350 the age of twelve and, therefore, could not legally state his preference. Mississippi Code Annotated § 93-11-65(1)(a) (Rev. 2004).

(9) Stability of the Home Environment
¶ 40. The chancellor found this factor to favor South, noting that Parker had moved the children three times since the entry of the agreed order and that she was now living with a second boyfriend within a relatively short amount of time. The chancellor found that Parker's transient lifestyle and the frequent change of persons in her home indicated a certain lack of stability that was absent from the living environment in South's home. The chancellor also noted that South owned his home with his wife, while Parker rented with her fiance. Based upon our review of the record, we can find no manifest or clear error in this finding.

(10) Emotional Ties Between Parent and Child
¶ 41. The chancellor found that this factor favored both parties equally, noting that both parties testified to the mutual love between Wyatt and each of them. Based upon our review of the record, we can find no manifest or clear error in this finding.

(11) Other Relevant Factors
¶ 42. The chancellor made no specific finding of other relevant factors.
¶ 43. Thus, to summarize, the chancellor found that factors 4, 5, and 10 weighed equally between the parties, factors 2 and 7 favored the mother, and factors 1, 3, 6, 9 and favored the father. Factor number 8 was not relevant at the time of this action as the minor child was under the legal age to state a preference, and factor number 11 did not come into consideration. In the end, the chancellor concluded that, based upon the totality of the circumstances, a change of primary physical custody was in the overall best interests of the child.
¶ 44. Clearly, as the chancellor acknowledged, neither of the parties to this case are perfect individuals. Yet, the chancellor had to make his decision based upon the best interests of the child, given the evidence that was put before him. While we find that the chancellor committed clear error in his finding on factor number 4, regarding employment, we find no manifest or clear error in the chancellor's application of any of the other factors; moreover, even though we find clear error in the chancellor's finding on this one particular factor, we do not find that this particular error tainted the chancellor's analysis and application as a whole. While we are not unmindful of the fact that the moral fitness factor predominated in the chancellor's analysis, we note that, regardless of this predominance, there were various other factors present that also weighed heavily into the chancellor's decision, and we cannot say, based upon what we find in the record, that the chancellor committed clear error or that the chancellor simply condemned Parker's lifestyle choices without any consideration of whether those choices had an adverse affect upon the minor child.
¶ 45. On the contrary, the final thrust of the chancellor's judgment was that all in all, the evidence demonstrated that the minor child was, in fact, being adversely affected by Parker's personal and parenting choices and that a change in custody would be in the child's best interest. Ultimately, the chancellor heard the testimony, viewed all of the other relevant evidence, assigned the weight and credibility to be given to the evidence, and made his judgment accordingly.
*351 ¶ 46. Upon our review of the record, notwithstanding our finding above that the chancellor erred in his finding on one of the factors, we can find no manifest or clear error or abuse of discretion in the chancellor's overall consideration and application of the Albright factors or in his ultimate conclusion that a change in custody was in the best interests of the child. The single factor that we find to be in error does not weigh heavily enough against the chancellor's overall analysis or ultimate conclusion so as to justify a reversal. The judgment of the Chancery Court of Pontotoc County, therefore, is affirmed.
¶ 47. THE JUDGMENT OF THE CHANCERY COURT OF PONTOTOC COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, CHANDLER, GRIFFIS, AND ISHEE, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.