950 So.2d 202 (2006)
James A. OWENS, Jr., Appellant
v.
Martha Sue OWENS, Appellee.
No. 2005-CA-00866-COA.
Court of Appeals of Mississippi.
October 10, 2006.
Rehearing Denied February 27, 2007.
*204 Phillip M. Whitehead, Booneville, attorney for appellant.
Elizabeth B. Fox, attorney for appellee.
Before KING, C.J., SOUTHWICK and IRVING, JJ.
IRVING, J., for the Court.
¶ 1. James Owens and Martha Owens agreed to an irreconcilable differences divorce. James and Martha were able to agree on some aspects of their divorce, and the matters that they could not resolve were submitted to the Chickasaw County Chancery Court, which divided the contested marital assets and granted custody of the parties' minor child to Martha. The court also declined to adjudicate a credit card debt specifically submitted by the parties. Aggrieved, James appeals and asserts the following points of error, which we quote verbatim:
1. Whether the Chancellor committed manifest error and abused his discretion in his holding awarding [sic] custody of Jordan Lance Owens, a minor, to his mother Martha S. Owens when uncontroverted testimony showed that James A. Owens was the primary caretaker of the child.
2. Whether the Chancellor committed manifest error and abused his discretion in his holding that James A. Owens was entitled to only $10,000.00 of a retirement fund/401k valued at $60,000.00.

*205 3. Whether the Chancellor committed manifest error and abused his discretion in failing to award James A. Owens any equity accrued in the Ford Expedition owned by the parties when uncontroverted evidence showed he contributed at least $7,000.00 to the purchase of the same from Social Security disability proceeds.
4. Whether the Chancellor committed manifest error and abused his discretion in failing to award James A. Owens an equal equitable division in the marital home even though the evidence show [sic] substantial contributions to the same both before and after his disability.
5. Whether the Chancellor committed manifest error and abused his discretion in failing to make an equitable apportionment of the debt accrued to remodel the home that was charged to the Master Card held in the name of James Owens.
¶ 2. Finding error, we affirm in part and reverse and remand in part.

FACTS
¶ 3. Martha and James were married on October 24, 1980, in Chickasaw County. Three children were born to the union: Jamie Paul, born July 28, 1980, and now emancipated; Magen Nicole, born May 8, 1989; and Jordan Lance, born April 5, 1998. The parties agreed that Martha should have custody of Magen. Therefore, the only contested custody issue was which parent should have custody of Jordan.
¶ 4. Sometime in 1992, James suffered an accident at work and became disabled. Although he is able to care for his children, he cannot work. James receives a monthly income from Social Security disability payments of around $950. Martha works for Wal-Mart, where she has been employed for over twenty-five years. Martha testified that she works around forty hours per week.
¶ 5. James and Martha ceased having marital relations on July 30, 2004, although they lived together until November 2004, when Martha was awarded the temporary use and possession of the marital home. At that time, James moved out of the house.
¶ 6. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Custody of Jordan
¶ 7. James contends that the chancellor failed to properly weigh the evidence presented in light of the Albright factors, and, therefore, he should have custody of Jordan rather than Martha.
¶ 8. When reviewing a chancellor's custody determination, we "will not disturb a chancellor's judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Copeland v. Copeland, 904 So.2d 1066, 1074(¶ 30) (Miss.2004) (quoting Chapel v. Chapel, 876 So.2d 290, 292-93(¶ 8) (Miss. 2004)). "Unless the evidence demands a finding contrary to the chancellor's decision, [we] will not disturb a custody ruling." Id. (citing Phillips v. Phillips, 555 So.2d 698, 700 (Miss.1989)). In making a custody determination, a chancellor is required to look at the factors enumerated in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). "[T]he polestar consideration in child custody cases is the best interest and welfare of the minor child." Copeland, 904 So.2d at 1074(¶ 31) (citations omitted).
*206 ¶ 9. In order to conduct as thorough a review as possible, we will address the chancellor's treatment of each of the Albright factors, as well as the chancellor's reliance on Sparkman v. Sparkman, 441 So.2d 1361 (Miss.1983), to which James objects.
Sparkman
¶ 10. In Sparkman, the Mississippi Supreme Court indicated that, "in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children [siblings] to be separated." Id. at 1363. The chancellor in the present case indicated that he relied heavily on this holding in awarding custody of Jordan to Martha, who also has custody of Magen. James contends that the chancellor placed too much emphasis on Sparkman, treating it as an "overriding" concern instead of looking at Jordan's best interests.
¶ 11. We note that Mississippi courts have been extremely hesitant to separate siblings. In Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997) (citing Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994); Franklin v. Kroush, 622 So.2d 1256, 1256 (Miss.1993); Arnold v. Conwill, 562 So.2d 97, 100 (Miss.1990)), the Mississippi Supreme Court stated: "Although there is no `hard and fast' rule that the best interest of siblings will be served by keeping them together, this Court has been extremely hesitant to separate siblings when their parents divorce."
¶ 12. However, a few cases have sanctioned the separation of children under certain circumstances. In Bowen v. Bowen, 688 So.2d 1374, 1382 (Miss.1997), the Mississippi Supreme Court affirmed a chancellor's decision to split up two siblings. The court noted that the chancellor had found that one child had stated a preference to live with his mother and had "apparent hostility towards his father," while the other child had difficulty living with his mother because of rumors about her relationship with another woman. Id. at 1381. The court emphasized that the visitation schedule in the case allowed the children significant time together and that the boys would both be attending the same school and would see each other at school. Id. at 1382. In short, the court approved the chancellor's finding that "it was in the best interest of each child to be placed in the custody of a different parent." Id. The court noted that the chancellor made this determination aware that "`it . . . is usually best not to split custody of the children,' but . . . [the split] was called for in this case for the reasons stated." Id. at 1381.
¶ 13. In Bell v. Bell, 572 So.2d 841, 846 (Miss.1990), the Mississippi Supreme Court approved a chancellor's split of two siblings, but noted that the general rule is that siblings should not be separated. Nevertheless, the court found that "[t]he record of proceedings below makes clear that the Court carefully regarded this circumstance and . . . [made] elaborate provision for assuring that Ray and Joc are together as much as is reasonably practicable given their residence in separate communities and their attendance at different schools." Id.[1]
*207 ¶ 14. In Carson v. Natchez Children's Home, 580 So.2d 1248, 1257 (Miss.1991) (citations omitted) (emphasis added), the Mississippi Supreme Court stated: "it is presumed that the best interest of a child will be served by remaining in the custody of the natural parent. Almost as strong is the imperative that siblings should not be required to live apart." The Carson court affirmed the chancellor's separation of two siblings, noting the chancellor's finding that an expert had recommended that the children be placed separately because the sexual abuse that they had suffered left them unable to interact appropriately together. Id. at 1257-58.
¶ 15. The general principle to be gained from these cases is that, when siblings have been separated, other circumstances have dictated that the division is in the best interest of the children. When other circumstances do not require the separation of children, Mississippi courts should attempt to keep siblings together. These principles are particularly brought into focus by our holding in Sootin v. Sootin, 737 So.2d 1022 (Miss.Ct.App.1998). In Sootin, we reversed the decision of a chancellor who opted to give custody of two sisters to separate parents. Id. at 1028(¶ 15). In so holding, we noted that the record did not contain substantial enough evidence to justify the custody split where the evidence indicated only that one sister had "slightly more" affection for her mother than for her father. Id. at 1027(¶ 15). We found that this fact was insufficient to create an "`unusual and compelling circumstance' . . . that would require [the children] to be separated in order to serve their best interests." Id. (quoting Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994)).
¶ 16. Therefore, although the chancellor in this case obviously placed great emphasis on the fact that granting James custody would split up Jordan and Magen, the chancellor did not err in relying on Sparkman in making its decision. While the placement of children with their siblings is not a concern that "overrides" the best interest of the child, our case law makes it clear that keeping siblings together is assumed to be in the best interest of a child, absent a showing that the circumstances in a particular case are to the contrary. Here, the chancellor addressed each of the Albright factors, including the reasoning of Sparkman as an additional factor. The chancellor ultimately found, after considering all of the Albright factors, that it was in Jordan's best interest to remain in the custody of his mother.
¶ 17. In 1983, the Mississippi Supreme Court expounded a list of non-exclusive factors that courts are to use in determining which parent should be awarded custody: age, health, and sex of the child; which parent had continuity of care prior to the separation; which parent has better parenting skills; which parent has the willingness and capacity to provide care for the child; employment status of the parents, including the responsibilities entailed by that parent's employment; age and health of each parent; which parent has a stronger emotional bond with the child; which parent is more morally fit to care for the child; "the home, school and community record of the child;" the child's preference if the child is old enough to express such preference; which parent has a more stable home and work environment; "and other factors relevant to the parent-child relationship." Albright, 437 So.2d at 1005. The chancellor in the present *208 case relied on and addressed these factors in making his custody determination. Although we find error with the chancellor's interpretation of one of the factors, we nonetheless find that the chancellor did not err in finding that it was in Jordan's best interest to remain in the custody of his mother.
Age, Health, and Sex of the Child
¶ 18. The chancellor found that this factor favors neither party. James contends that this factor favors him because he alleges that he has provided primary care for Jordan since he was born. We note that a parent's continuity of care is addressed as a separate factor under Albright. As the chancellor found, there was little to no evidence presented that would make this factor favor either parent. However, we note that the only evidence presented about Jordan's health is that he is allergic to cigarette smoke, and James smokes, while Martha does not. The chancellor properly found that this factor does not weigh against James because the evidence strongly indicates that James has made great effort to avoid smoking around Jordan. Therefore, the chancellor did not err in finding that this factor favors neither party.
Continuity of Care
¶ 19. The chancellor found that both parties claimed to provide continuous care for Jordan prior to their separation, and ultimately found that this factor favors neither party. James claims that the court erred in finding that he is not favored by this factor, as he does not work and, during his marriage to Martha, took care of Jordan during the day while Martha was at work. However, Martha clearly testified that she took care of Jordan during the evenings after she got home from work. She also testified that she generally took care of Jordan's health problems, went to more of his school functions, and took him to church every Sunday. Allegedly because he did not like Martha's church, James declined to go to church with his family. There is clearly evidence on this point to support the chancellor's finding that both parties shared the responsibility of caring for Jordan before the parties' separation. Therefore, the court did not err in finding that this factor favors neither party.
Parenting Skills
¶ 20. The chancellor found that this factor also favors neither party, as both Martha and James have nearly equal parenting skills. In their briefs, both parties claim that the evidence shows that they each have superior parenting skills. James points to the fact that he cared for Jordan all day and points to his allegation that Martha allowed Jordan to watch PG-13 movies. Martha points out that it was she who attended the majority of Jordan's school functions and she who takes Jordan to church every week. We note that the evidence indicates that both Martha and James have sufficient parenting skills to care for Jordan. Although James testified that Martha allowed Jordan to watch a PG-13 movie, we note that Martha testified, and James admitted, that James has often cursed in front of Jordan and made other ugly remarks while in Jordan's presence. Therefore, the evidence offered by each party indicates that neither have perfect parenting skills, but both have adequate skills. Therefore, the chancellor did not err in finding that this factor favors neither party.
Capacity to Provide Care
¶ 21. The chancellor found that this factor also favors neither party, as both Martha and James are willing and able to provide care for Jordan. James contends that this factor should favor him, but he again conflates this factor with other factors. First he points out that he has cared *209 for Jordan since birth, an allegation that we have already addressed as part of the continuity of care factor. Next he points out his lack of employment and Martha's employment responsibilities. However, that fact is properly addressed under the next Albright factor, which addresses a parent's employment status and responsibilities. The evidence in this case indicates that both parents are able and willing to provide for Jordan. Therefore, the chancellor did not err in finding that this factor favors neither party.
Employment Status
¶ 22. In discussing this factor, the chancellor found that "[o]ur Supreme Court has said that a parent's gainful employment should not be a negative factor in deciding custody. The Court finds that this factor favors neither party." James contends that the court erred in making this finding, as his employment responsibilities, or lack thereof, mean that he will have an abundance of time for Jordan, whereas Martha works forty hours a week and testified that she will have to hire a babysitter several days a week.
¶ 23. We have diligently searched both Mississippi case law and federal case law, but have failed to find any instance where the Mississippi Supreme Court or the United States Supreme Court has said that a parent's gainful employment cannot be held against the parent in a custody dispute. In fact, although some Mississippi case law indicates that it is better for a parent to be gainfully employed, there are many Mississippi cases advocating exactly what James urges: that this factor favors a parent who has less employment responsibilities, and therefore more time for his child.
¶ 24. In Hammers v. Hammers, 890 So.2d 944, 952(¶ 25) (Miss.Ct.App.2004), this Court affirmed the decision of a chancellor who found that this factor favored a mother who was unemployed over a father who was self-employed. The chancellor found that this factor favored the mother because she had more time to devote to her children; on appeal, the father contended that this finding was in error. Id. at 952 (¶¶ 24-25). We affirmed, finding that "credible evidence" supported the chancellor's determination. Id. at 952(¶ 25). In Ivy v. Ivy, 863 So.2d 1010, 1014(¶ 11) (Miss.Ct.App.2004), we again affirmed the decision of a chancellor who found that this factor favored placing custody with a mother who worked less rather than a father who worked long hours. We specifically found: "though [the father's] long hours at work may be laudatory in terms of demonstrating his desire to provide financial support for the children, an adjudication of custody in his favor would not be an appropriate means of rewarding such behavior." Id. (emphasis added). In Copeland, 904 So.2d at 1076(¶ 42), the Mississippi Supreme Court affirmed a chancellor's preference of a father who had a "more flexible schedule" which allowed him to spend more time with his child.
¶ 25. However, in other cases we have affirmed decisions which found that this factor favored a parent who was gainfully employed over a parent who was unemployed or who had sporadic employment. For example, in Beasley v. Scott, 900 So.2d 1217, 1220-21(¶ 10) (Miss.Ct.App.2005), we affirmed the decision of a chancellor who found that this factor favored a father who had had stable employment for over ten years rather than a mother who had had sporadic employment during the same time period. In Parker v. South, 913 So.2d 339, 348-49(¶ 32) (Miss.Ct.App.2005), we found that a chancellor's determination on this factor was "clearly erroneous" because the chancellor found that this factor favored neither party. Instead, we determined that the chancellor should have *210 found that this factor favored a mother who had gainful employment over a father who was unemployed at the time of the judgment. Id. In another case, Glissen v. Glissen, 910 So.2d 603, 613-14 (¶¶ 37-39) (Miss.Ct.App.2005), we affirmed the decision of a chancellor who found that this factor favored a father who had held the same job for twelve years rather than a mother who had worked at the same job for only two years. On appeal, the mother claimed that this finding was in error, specifically because evidence at trial indicated that the father worked long hours four days a week, which prevented him from being home with his children during some days of the week. Id. at 613-14(¶ 38). Despite the fact that the father worked long hours, we found that the chancellor had not abused his discretion in finding that this factor favored the father. Id. at 614(¶ 39). Additionally, some opinions have addressed this issue under another factor, the stability of the home and employment of a parent. See Jerome v. Jerome, 689 So.2d 755, 759 (Miss.1997); Beasley, 900 So.2d at 1221(¶ 16); Horn v. Horn, 909 So.2d 1151, 1161(¶ 34) (Miss.Ct. App.2005).
¶ 26. This factor appears to be applied in two ways: either to prefer a parent who draws an income over one who does not, or, more often, to prefer a parent who works less or not at all and can therefore spend more time with his children. In the cases we have found where an unemployed parent was preferred, the reason cited is the time that the parent can spend with the child. In cases where an employed parent is found more suitable under this factor, the reasoning is that the unemployed parent has no source of income or appears to be unable to hold a steady job. Under either reasoning, this factor clearly favors James. He is disabled and does not work, and can therefore spend more time caring for Jordan. Although he is unemployed, he still draws an income from Social Security disability payments. Furthermore, James is not unemployed because he cannot hold a stable job, but because he is disabled and unable to work. Martha has presented no additional argument to explain why this factor should favor her rather than James. The chancellor erred in finding that this factor favors neither parent, as it clearly favors James.
Age and Health of Parents
¶ 27. The chancellor found that age was not a factor for either parent, but that "Martha is slightly better physically to take care of Jordan." James points out that the chancellor found earlier in his opinion that James is physically capable of caring for Jordan. Martha contends that the court was correct in finding that this factor favors her, as the evidence indicates that James suffers from anxiety and stress and is on several medications. Testimony at trial also indicated that, while James is able to provide sufficient care for Jordan, he is physically limited as to what he can do with Jordan. James admitted that his physical problems prevent him from doing everything with Jordan that he wants to do. Therefore, the chancellor did not err in finding that this factor favors Martha.
Emotional Bond
¶ 28. The chancellor found that Jordan loves both Martha and James, and that both Martha and James love Jordan. James contends that this finding was in error, and points out again that he has provided care for Jordan. We note again that James' care of Jordan has been addressed under the factor questioning which parent had continuity of care prior to separation. There was no evidence produced to indicate that Jordan loves either of his parents more than the other, nor was any evidence presented which indicated that *211 Martha has less of an emotional bond with Jordan than James does. Therefore, the chancellor did not err in finding that this factor favors neither party.
Moral Fitness
¶ 29. The chancellor found that both James and Martha are morally fit to care for Jordan. James does not contend that this is in error, but Martha claims that this factor should favor her because she takes Jordan to church and does not swear in front of Jordan as James has done in the past. Although James admitted that he has used inappropriate language in front of Jordan, the evidence presented still indicates that James is morally fit to care for Jordan. In short, there is no doubt that both James and Martha are morally fit to care for Jordan. Therefore, the chancellor did not err in finding that this factor favors neither party.
Community Record
¶ 30. The chancellor found that this factor slightly favors Martha because Jordan has lived in her home his entire life and does well in school there. James contends that the court's finding on this point is in error because "Jordan is only beginning his life and schooling outside the home and the constant care of his father." Since Jordan has done well in school while living in Houston, Mississippi with his mother, and since living with his father would require a move to another city, the chancellor did not err in finding that this factor slightly favors Martha.
Preference of Child
¶ 31. The chancellor properly found that Jordan is too young to state a preference as to which parent he would prefer to live with.
Stability of Environment
¶ 32. The chancellor found that both James and Martha could provide an adequate, stable environment for Jordan to live in. Therefore, the chancellor found that this factor favors neither James nor Martha. James contends that this is in error, and points again to the fact that Martha works and has more time commitments than James. However, the evidence presented indicates that Martha can provide as stable a home environment as James. We have already found that the chancellor erred in not finding that the employment factor favors James. Martha's employment, while not preferable to James' amount of free time, does not necessitate a finding that she cannot provide a stable home environment for Jordan. Therefore, the chancellor did not err in finding that this factor favors neither party.
Other Factors
¶ 33. The chancellor addressed the separation of Magen and Jordan as a significant other factor that strongly favors Martha. We have already discussed why the chancellor was not in error for finding that this factor strongly favors Martha.
Best Interest of Jordan
¶ 34. Ultimately, the chancellor determined that it was in Jordan's best interest to live with Martha and not James. James contends that this determination is in error. Although we find that the chancellor erred in finding that the employment factor favors neither party instead of favoring James, we still find that substantial evidence supports the chancellor's decision to place Jordan with Martha. Regardless of the fact that the employment factor favors James, all the other factors reviewed by the chancellor properly favored neither parent or favored Martha.
¶ 35. Although James contends that the chancellor improperly allowed the separation of Magen and Jordan to override Jordan's best interest, our review of the chancellor's opinion reveals that this is not the *212 case. The chancellor specifically determined what was in Jordan's best interest, based on all the Albright factors and based on the potential separation of Magen and Jordan. Although the separation of siblings should not override a child's best interest in a custody determination, siblings should be kept together whenever possible. In essence, the rule from our case law is that the non-separation of a child from his or her siblings is usually in a child's best interest. In all the cases where we have approved the separation of siblings, we have found that the separation is in a child's best interest. Here, there is nothing to indicate that separation from his sister would be in Jordan's best interest. Therefore, the chancellor did not err in finding that Jordan's best interest dictates that Martha retain primary custody of him.
Ferguson Factors and Equitable Distribution
¶ 36. In order to facilitate our discussion of the remaining issues, which all deal with the division of the marital property, we first analyze the chancellor's findings regarding the factors for equitable distribution found in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). As with child custody determinations, we "[employ] a limited standard of review of property division and distribution in divorce cases." Owen v. Owen, 928 So.2d 156, 160(¶ 10) (Miss.2006) (citing Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997)). We will uphold a chancellor's division of marital assets as long as that division "is supported by substantial credible evidence." Id. (citing Carrow v. Carrow, 642 So.2d 901, 904 (Miss.1994)). We "will not hesitate to reverse if [we find that] the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." Id. at 160(¶ 11) (citations omitted).
¶ 37. In Ferguson, the Mississippi Supreme Court listed a non-exclusive list of seven factors that chancery courts should use when determining an equitable division of marital property: (1) contribution to the accumulation of marital wealth, (2) disposition of marital assets, (3) market and emotional value of the marital assets, (4) value of non-marital assets, (5) tax and other economic consequences of the division of the property, (6) minimization of future friction between the parties, and (7) the needs of the parties and their income and earning capacity. Ferguson, 639 So.2d at 928. In determining the first factor, the contribution to the marital assets, the court suggested that chancellors look at economic contribution to the marital wealth, "[c]ontribution to the stability and harmony of the marital and family relationships," and "[c]ontribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets." Id.
¶ 38. The Mississippi Supreme Court has made it clear since Ferguson that courts are to look at both a party's economic contributions to the marriage and the party's domestic contributions. See Berryman v. Berryman, 907 So.2d 944, 946-47(¶ 13) (Miss.2005) (quoting Berryman v. Berryman, 907 So.2d 944 (Miss.Ct. App.2004)); Hensarling v. Hensarling, 824 So.2d 583, 596-97 (¶¶ 44-49) (Miss.2002) (dissenting opinion says that Mississippi jurisprudence clearly takes into account both economic and domestic contributions); Selman v. Selman, 722 So.2d 547, 552(¶ 16) (Miss.1998); Henderson v. Henderson, 757 So.2d 285, 292(¶ 33) (Miss.2000) (quoting Bullock v. Bullock, 699 So.2d 1205, 1211(¶ 24) (Miss.1997)); Watson v. Watson, 724 So.2d 350, 356(¶ 26) (Miss.1998) (citing Ferguson, 639 So.2d at 928). Although Ferguson itself did not list domestic contributions in regard to the first factor, *213 the Ferguson court made it clear that such contributions are to be given significant weight in determining a party's contribution to marital assets: "Although contributions of domestic services are not made directly to a retirement fund, they are nonetheless valid material contributions which indirectly contribute to any number of marital assets, thereby making such assets jointly acquired." Ferguson, 639 So.2d at 934.
¶ 39. The chancellor in this case addressed some, but not all, of the Ferguson factors in distributing the marital estate. The chancellor found that most of the factors favored neither James nor Martha, but did find that Martha had made more contributions to the acquisition of marital assets, Martha had more emotional attachment to the family home, and Martha had been a good mother and wife, but James had disrupted the harmony of the marriage toward the end of the marriage. Notably, the chancellor neglected to address altogether the factor relating to the parties' income and ability to provide for themselves.
¶ 40. After reviewing the record, we find that the chancellor erred in his analysis and application of the Ferguson factors. First, the chancellor found that Martha had made greater contributions to the marriage because she had worked and contributed economically to the marriage. No attempt was made to determine the domestic contributions of the parties, even though Ferguson and more recent Mississippi case law indicates that a party's domestic contributions to a marriage must be taken into account under this factor.
¶ 41. Second, the chancellor found that Martha had a greater attachment to the marital home because "she lives there and it is where she reared her children." This logic would apply equally to James, excepting the brief time period when he had to move out of the home as a result of the divorce proceedings. If rearing one's children in a home grants one a greater emotional attachment to the home, then James also had a significant emotional attachment to the house.
¶ 42. Finally, the chancellor entirely neglected to address the factor pertaining to the parties' income and ability to provide for themselves. Although chancellors are permitted to omit a discussion of factors that do not apply "to the marital property at issue," this factor clearly applied to an equitable division of the Owenses' assets. See Sproles v. Sproles, 782 So.2d 742, 748 (¶¶ 23-25) (Miss.2001) (citing Weathersby v. Weathersby, 693 So.2d 1348, 1354 (Miss. 1997)). The evidence produced indicated that James' disability prevents him from obtaining employment. By contrast, the testimony indicated that Martha is in a much better position to provide for herself, but this factor was not even addressed by the chancellor. On remand, the chancellor should address this factor and discuss his findings as to the implications of this Ferguson factor.
2. Retirement Fund
¶ 43. The chancellor noted that Martha's retirement fund is worth about sixty thousand dollars, and then gave James ten thousand dollars as his equitable share of the fund. In doing so, the chancellor apparently put great weight on the fact that Martha earned the money, that Martha stated that she intends to use the money to educate her children, that James was disabled for most of the time that the money was accrued, that James does not pay any child support for his children (the only money they get is from his disability payments), and that James' disability "will prohibit his contribution to the post high school education of the children." Nothing other than these facts is *214 related as support for the chancellor's decision to award James only one-sixth of the value of the retirement fund.
¶ 44. James contends that the chancellor erred in awarding him only one-sixth of the value of the retirement fund. As support, he points out that domestic contributions are generally assumed to be equal to the financial contributions of a working spouse. James also contends that, while a chancellor can make any split that equity demands, a one-half split of marital assets is generally considered to be equitable. James argues that the chancellor improperly devalued his contributions to the marriage, as the chancellor did not appear to recognize the financial contributions made to the marriage while he was working and later made as a result of his disability, nor did the chancellor recognize James' substantial domestic contributions as the primary child-care giver while Martha worked. James also contends that the chancellor's reliance on Martha's assertion that she will use the retirement money to educate their children is misplaced.
¶ 45. Martha offers very little response to James' arguments, other than to contend that the chancellor's division of the retirement fund is in line with the analysis found in Ferguson. Martha also contends that this case is very similar to Sandlin v. Sandlin, 906 So.2d 39 (Miss.Ct.App.2004) and that Sandlin necessitates that we affirm the decision of the chancellor in this case.
¶ 46. Our review of the Ferguson factors does not yield an explanation for the chancellor's decision to award James only one-sixth of the value of Martha's retirement fund. It appears from the record that, although James was unable to work for most of the time during which the retirement fund was accrued, he made substantial domestic contributions to the marriage during that time. "We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic, or otherwise, are of equal value." Hensarling, 824 So.2d at 597(¶ 48) (quoting Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994)). Furthermore, as we have already discussed, the chancellor must look at the parties' respective incomes and their ability to provide for themselves when determining a proper split of this asset.
¶ 47. We also note that most of the observations cited as support by the chancellor should have had no bearing on the division of this asset. First, Martha's statement that she intends to use the fund to educate her children means little, as she is not obligated to do so in any way. Furthermore, in divorce cases, a chancellor is supposed to equitably divide marital assets, not attempt to determine which parent will spend more of those assets on his or her children. If one party intends to spend all of her portion of the retirement fund on her children's education, and the other party wants to spend his portion of the retirement fund on alcohol and cigarettes, the latter party should not be punished for such in the chancellor's distribution of the assets. For the same reasons, James' inability to pay child support payments should have nothing to do with what percentage of a retirement fund he receives. Lack of child support has nothing to do with an equitable division of marital property.
¶ 48. Although Martha contends that Sandlin supports the chancellor's findings as to the retirement fund, we do not find Sandlin persuasive on this point. Although the husband in Sandlin was awarded the entire benefit of his retirement fund, and although the evidence showed that his income was around three times that of the wife's, the retirement fund was not an issue in Sandlin. Sandlin, 906 *215 So.2d at 42-43(¶ 14). We merely pointed out that the chancellor's award of the entire value of the marital home to the wife in Sandlin was offset by the husband's retention of the entirety of his retirement fund. Id. While Sandlin bears some minor factual similarity to the present case, Sandlin is clearly distinguishable from the case at bar and does not require that we affirm the chancellor's division of Martha's retirement fund.
¶ 49. Because we find that the chancellor applied an erroneous legal standard, we reverse and remand for a new determination of the proper division of the retirement fund. On remand, the chancellor should take care to address all of the relevant Ferguson factors and should also take care to not take into account factors that bear no relevance to an equitable division of the retirement fund. This equitable division need not be an equal split of the fund, but must be based on the correct legal standard.
3. Vehicles
¶ 50. Martha and James submitted the ownership of their two vehicles, a Cutlass and an Expedition, as an issue for the chancellor to rule upon. The chancellor noted in his opinion that there was no testimony as to the value of the Cutlass. Because the evidence indicated that James used the Cutlass while Martha primarily used the Expedition, the chancellor awarded James ownership of the Cutlass and Martha ownership of the Expedition.
¶ 51. James points out that the evidence indicates that he paid at least $7,000 toward the purchase of the Expedition, which cost over $30,000 at the time of its purchase, and had a balance of only around $2,300 left on it at the time of the divorce proceedings. Martha contends that the chancellor was correct and points out that she also paid a substantial amount toward the purchase of the Expedition and that she was the one who ordinarily used the Expedition, while James used the Cutlass.
¶ 52. We find that adequate evidence supports the chancellor's division of these assets. Although there was little evidence produced to indicate the relative value of these two vehicles, they were both of about the same age. Furthermore, the evidence presented indicated that Martha primarily used the Expedition, while James used the Cutlass. Although the testimony indicated that James paid around $7,000 for the Expedition, if the vehicle had a cost of around $30,000 when it was purchased, that leaves $23,000 which Martha presumably paid. Therefore, the chancellor did not err in choosing to give the Cutlass to James and the Expedition to Martha.
4. Marital Home
¶ 53. In this point of error, James claims that the chancellor inequitably divided the marital home. The basis of James' argument is that the chancellor chose a value for the house that is wholly unsupported by the evidence, so that, even though James received half of the value of the home as calculated, he received less from the judgment than he should have.
¶ 54. The chancellor valued the marital home and land as worth $47,500. The chancellor appears to have achieved this figure by taking the median between James' valuation of the property at $50,000 in his financial statement and Martha's valuation of the property at $45,000 in her financial statement. Martha's valuation of the property was called into question during her testimony, but we find that there is sufficient evidence from which the chancellor could determine that the value of the property was $47,500.
*216 ¶ 55. During her cross-examination, Martha testified that the house had been appraised a few years before, and the appraisal value was $50,000. Martha testified that work had been done on the home to redo a bathroom, to redo a laundry room, and to redo a utility room, but did not specify whether the renovations were done before or after the appraisal of the home. Martha also testified that ceiling fans were put in the home at the same time as the other renovations. James testified that he and Martha paid a total of around $67,000 for the house "after interest and everything." James valued the property at around $50,000, based on the appraisal that had been done. It is not clear from James' testimony whether any renovations to the home were done before or after the appraisal at $50,000, although he contends in his brief that the renovations were done after the appraisal. However, we can consider only those facts presented to us in the record for review. Seaney v. Seaney, 218 So.2d 5, 8 (Miss. 1969) (quoting Alexander v. Hancock, 174 Miss. 482, 498, 165 So. 126, 126 (1936)).
¶ 56. James testified that he added a room onto the house, but Martha did not testify about the addition of a room; instead, Martha testified that existing rooms had been renovated. Again, nothing in the record indicates whether these renovations would have been before or after the appraisal of the home. The chancellor's valuation of the property at $47,500 is further supported by Martha's testimony that the house is in need of repairs, such as painting and a new septic system. Therefore, we find that the chancellor did not err in placing the value of the house at $47,500 and awarding James half of that value as his equitable share of the house.
5. MasterCard Debt
¶ 57. In his opinion, the chancellor stated that he had insufficient evidence to form an opinion as to which party should be responsible for the MasterCard debt. We note that the evidence was clear that the card was in James' name. Furthermore, James testified that he had incurred around $3,000 in debt on the MasterCard to pay for the aforementioned improvements to the marital home. During her testimony, Martha specifically testified that she did not deny that James had spent this money. Although no receipts were offered into evidence, there was still evidence from which the chancellor could equitably divide this debt, which appears to be a marital debt.
¶ 58. We note that this issue was specifically given to the chancellor to adjudicate by James and Martha. The chancellor cited Glass v. Glass, 857 So.2d 786 (Miss. Ct.App.2003) as support for his refusal to adjudicate the debt, but declined to explain why the case provided a basis for refusing to divide the debt. After reviewing Glass, we find that it did not entitle the chancellor in this case to refuse to adjudicate the debt in question.
¶ 59. In Glass, we affirmed the decision of a chancellor who found that he had insufficient information with which to adjudicate a marital debt. Id. at 789(¶ 7). In so holding, we noted what information the chancellor had received:
[One party] failed to provide any information concerning finances, including failing to submit the required financial declaration pursuant to Rule 8.05 of the Uniform Chancery Court Rules. On [the other party's] financial declaration she included a statement of liabilities listing the names of credit card companies, medical service persons and other businesses and listed a current balance for each creditor. No accompanying statements or bills were submitted for these liabilities, and the chancellor determined *217 that some of the obligations were incurred subsequent to the couple's separation and were obtained by fraudulent means. After the trial at the chancellor's request, data concerning the payment history of two mortgages on the home was partially furnished in what the chancellor called a "very confusing" format.
(emphasis added). Id. In addition to this issue in Glass, insufficient evidence existed for the chancellor to rule on a second issue. The chancellor again informed the parties that he had insufficient information to adjudicate this issue as well. Id. at 791 (¶¶ 16-17). It is clear in Glass that the chancellor, recognizing that insufficient information had been presented to him, informed the parties of the deficiency and requested additional information.
¶ 60. In this case, the issue of the MasterCard debt had specifically been put before the chancellor for adjudication. Although the evidence concerning the debt was sparse, there was still evidence from which the chancellor could have adjudicated the debt. We note that this point appears to be conceded by Martha, as her brief does not contend that the chancellor was correct in deciding that he had insufficient information, but instead argues to the merits of the claim by pointing out that the credit card was in James' name. At trial, Martha stated specifically that, if James contended that the purchases to renovate the home a few years before had been put on the MasterCard, she would not dispute the veracity of that statement.
¶ 61. Furthermore, we hold that a chancellor should not refuse to adjudicate an issue which has specifically been placed before the chancellor for adjudication on the basis of insufficient evidence without first informing the parties that they have not provided sufficient information for adjudication. However, in this case, sufficient information was presented to allow adjudication of the responsibility for the debt. Therefore, on remand, the chancellor should adjudicate the MasterCard debt as the parties have requested.
¶ 62. THE JUDGMENT OF THE CHANCERY COURT OF CHICKASAW COUNTY IS AFFIRMED AS TO ISSUES ONE, THREE AND FOUR, AND REVERSED AND REMANDED AS TO ISSUES TWO AND FIVE FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. THREE-FIFTHS OF THE COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT, AND TWO-FIFTHS OF THE COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] In Bell, both children had originally been placed in the custody of their mother, but the custody order also specified that the children were to be kept in the Tupelo area. Bell, 572 So.2d at 843. Sometime thereafter, the mother desired to move to Jackson, and the custody issue was reopened. Id. at 843-44. There was evidence that the father was engaged in an adulterous relationship with another woman who was still married at the time, and the Mississippi Supreme Court noted that this "did [not do] the children much good either." Id. at 844. Upon reevaluation, the chancellor in Bell determined that the youngest child should remain in the custody of his mother, but that custody of the oldest son should be given to his father because he had expressed a preference to live with his father. Id.