# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01150-COA

**TIFFANY MICHELLE TILLEY**                                              **APPELLANT**

**v.**

**JOHN MICHAEL GIBBS**                                              **APPELLEE**

DATE OF JUDGMENT:                10/20/2022
TRIAL JUDGE:                        HON. RODNEY PURVIS FAVER
COURT FROM WHICH APPEALED:          LOWNDES COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:             WILLIAM PAUL STARKS II
ATTORNEY FOR APPELLEE:              HAL H. H. McCLANAHAN III
NATURE OF THE CASE:                 CIVIL - DOMESTIC RELATIONS
DISPOSITION:                        AFFIRMED - 05/21/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     Tiffany Tilley appeals from the Lowndes County Chancery Court's judgment awarding her ex-husband John Gibbs physical custody of their daughter V.G.[1] Tiffany claims the chancellor was manifestly wrong in his *Albright* analysis and erred by awarding custody of V.G. to John. Finding no reversible error, we affirm the chancellor's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.     John and Tiffany were married on April 6, 2019, in Lowndes County, Mississippi.[2] The parties had one child, V.G., born prior to the marriage on December 19, 2018. On

---

[1] Initials are used to protect the identity of the minor child.

[2] Tiffany had a son from a prior relationship, B.S., who was in Tiffany's mother's custody at the time of John and Tiffany's marriage.

December 14, 2021, John filed his original complaint for divorce against Tiffany. Tiffany filed her answer to the complaint and a counterclaim, and the matter was set for a temporary hearing. On the date of the hearing in January 2022, the parties agreed to a temporary order granting Tiffany custody of the minor child and granting John visitation. At trial in May 2022, the parties agreed to withdraw fault grounds for divorce and proceeded on the contested issue of custody and child support. Both sides presented several witnesses at trial and the chancery court took the matter under advisement.

¶3.     While awaiting the court's decision, Tiffany filed a supplemental motion for a protective order against John concerning messages he sent to her containing possible threats and harassment. John filed a response admitting he sent the messages but denying the messages were directed at Tiffany. The matter was set for a hearing on September 13, 2022, but Tiffany requested that the court hold the matter in abeyance without a hearing.

¶4.     On September 16, 2022, the chancery court issued its opinion and final judgment, granting an irreconcilable differences divorce, awarding joint legal custody with John being awarded physical custody. The court awarded Tiffany visitation and ordered her to pay child support of $490.00 per month. Thereafter, Tiffany filed a motion for a new trial, or to alter or amend the final judgment, advancing arguments including failure to consider certain material and substantial evidence in making an *Albright* analysis.[3] On October 20, 2022, the chancery court entered an order amending the opinion and final judgment to correct dates and

---

[3] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

names but denied Tiffany's request for reconsideration of custody. Tiffany subsequently filed the instant appeal.

## STANDARD OF REVIEW

¶5.     Our "standard of review for a child-custody case is a narrow one." *Munday v. McLendon*, 287 So. 3d 303, 309 (¶25) (Miss. Ct. App. 2019). We "will affirm the child-custody decree if the record shows any ground upon which the decision may be justified." *Brumfield v. Brumfield*, 49 So. 3d 138, 142 (¶9) (Miss. Ct. App. 2010) (emphasis added). This Court "will not reverse unless the [chancellor] made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard." *Munday*, 287 So. 3d at 309 (¶25).

## DISCUSSION

¶6.     On appeal, Tiffany claims the chancellor erred in his consideration and application of the factors utilized to determine custody of V.G. For cases "appeal[ing] from child-custody decisions, 'our polestar consideration,' like the chancellor's, 'must be the best interest of the child.'" *Id*. at 309 (¶26) (quoting *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009)). To determine the result that would be in the child's best interest, the chancellor considers the *Albright* factors set out as follows:

> (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and

3

community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.

*Street v. Street*, 936 So. 2d 1002, 1009 (¶20) (Miss. Ct. App. 2006) (quoting *Albright*, 437 So. 2d at 1005). "'All the factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way [he] sees fit' in determining where the child's best interest lies." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)).

¶7. Tiffany claims that many of the factors that were either weighed in John's favor or found to be neutral should have been found in her favor, including continuity of care; age, health, and sex of the child; parenting skills and willingness to provide primary care; employment of the parent and responsibilities of employment; physical and emotional fitness and age of the parents; stability of home environment; and separation of siblings. We address each challenged factor in turn.

### 1. Age and Sex of the Child

¶8. On appeal, Tiffany argues "that the chancellor did not give sufficient weight to the sex of the children when considering a female child in the tender years[,]" and that "there is still a presumption that a mother is generally better suited to raise a young child." The chancellor found that at the time of trial, V.G. was a three-and-a-half-year-old female child. But the chancellor determined that V.G. was not dependent on Tiffany for her physical welfare and that John was capable and equally adept at caring for her. The court's order noted that the

4

tender years doctrine is only a presumption and concluded that this factor was neutral.

¶9.	"Mississippi law does not support [the] argument that a child's mother, as opposed to the father, is the best caregiver by default." *Sellers v. Rinderer*, 248 So. 3d 930, 934 (¶12) (Miss. Ct. App. 2018). Defining the tender years presumption,

> The tender years doctrine is not a rule, but merely a presumption that, 'in all cases where any child is of such tender age as to require the mother's care for its physical welfare, it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons.'

*Street*, 936 So. 2d at 1010 (¶23) (quoting *Law v. Page*, 618 So. 2d 96, 101 (Miss. 1993)). The tender years presumption has weakened over time. *See Kerr v. Kerr*, 323 So. 3d 462, 477 (¶56) (Miss. 2021).

¶10.	Tiffany's argument implies that she should have been favored under this factor by default as the mother. But John had the opportunity to overcome the presumption with evidence showing that he was equally capable of caring for her. Ample evidence in the record shows that Tiffany was absent from the marital home and V.G.'s care for a significant period during the marriage (approximately 170 days over a span of twelve months, give or take a few contested dates), leaving John to care for the child without her mother. Further diminishing the tender years presumption, evidence demonstrated the role of additional family members who provided assistance as caregivers, including William Gibbs, John's father, and Albert Baker, Tiffany's grandfather. John testified to numerous examples of his pattern of care to illustrate that he was equally capable of providing the care needed by his

5

daughter. Further, Tiffany did not offer evidence to dispute that John was equally capable of taking care of their daughter, nor did she demonstrate any reason as to why she is better suited to raise her. Substantial evidence supports the court's ruling that the tender years presumption was overcome based on the ability of others to equally care for her. As such, the chancellor did not abuse his discretion by finding this factor neutral or in the weight he assigned to it.

### 2. Continuity of Care

¶11. Tiffany also claims the chancery court erred in its application of the continuity of care factor. She argues the chancellor's conclusion that John or his father were the primary caregiver was erroneous because of his work schedule's affect on his ability to be present during the hours of the day when V.G. was awake. She also argues the chancellor's finding was unfounded due to the fact that she had primary custody during the temporary order, changed her actions, and ended up being the parent with the most continuity of care. She contends that neither she nor John had an advantage for the factor of continuity of care prior to separation because both were heavily assisted in their care by family.

¶12. As previously noted, the chancellor determined that Tiffany spent the night away from the marital home at least 170 times from December 2020 until November 2021. The chancellor also found that regardless of the disputes over a few contested dates and reasons for her absence, Tiffany admitted she was away from V.G. on these nights with another man. Thus, the chancellor concluded that "John and/or his father were the primary caregivers for

6

V.G. prior to separation" and held that this factor favored John.

¶13. We first address Tiffany's argument that care of V.G. prior to their marriage separation should not have favored John. Tiffany's claim that it was impossible for John to be the primary caregiver narrowly focuses on the nighttime care of their daughter, but the continuity of care factor is not limited in such a way. Although John often worked nights and she was in William's or Baker's care at night, there is substantial evidence in the record showing that John provided continuous care for her in a wide range of ways. John testified that during their marriage, he took the second shift or late job at Dollar General so that he could take care of both children in the mornings. This included feeding them breakfast, getting them dressed, ensuring B.S. got on the school bus, and taking V.G. to daycare. William testified that when he had V.G. in his care, John would call on a regular basis to check on her but William never received a call from Tiffany checking on the child. Also, the testimony at trial indicated that on the many nights Tiffany did not come home, she did not make arrangements for V.G.'s care. Instead, she would call John to inform him that she was not coming home and he took responsibility to call someone and arrange for them to pick up and take care of V.G. until he completed his shift at work. Reviewing the record, we find substantial evidence to support the chancellor's finding that John was the primary caregiver prior to their separation.

¶14. However, our analysis does not end at the time of their separation. "The original articulation of the *Albright* factors directed the chancery court to consider the continuity of

care prior to separation[,]" but the Mississippi "Supreme Court has since held that care after separation must be considered as well." *Case v. Case*, 339 So. 3d 796, 804 (¶22) (Miss. Ct. App. 2022) (quoting *Edwards v. Edwards*, 189 So. 3d 1284, 1287 (¶11) (Miss. Ct. App. 2016)); *see also Caswell v. Caswell*, 763 So. 2d 890, 893 (¶8) (Miss. Ct. App. 2000) (holding chancellor must consider continuity of care prior to and after separation). Tiffany contends she should have been deemed the primary caregiver during the period of post-separation. In furtherance of this argument, she highlights that she was given physical custody of V.G. during their separation pursuant to the temporary order, she altered her work hours to fulfill this responsibility, and she therefore had been the primary caregiver for the eight months preceding the custody judgment.

¶15. But we find Tiffany's claim that she was the primary caregiver post-separation is flawed because her claim is based heavily upon the legal status granted under the temporary order and fails to account for the "continuous" aspect of care. "[T]his Court has recognized that a 'chancellor must conduct an *Albright* analysis and decide the issue of permanent custody de novo *regardless of the temporary order*.'" *Lambes v. Lambes*, 345 So. 3d 592, 604 (¶49) (Miss. Ct. App. 2022) (emphasis added) (quoting *Sanders*, 281 So. 3d at 1054 (¶43)). Because the chancellor is instructed to conduct the *Albright* analysis independent of the temporary order, it was appropriate for him to not focus his findings simply on the temporary award of physical custody to Tiffany in his analysis of the continuity-of-care factor. Further, the evidence supports the finding that after separation John continued to

8

spend time with V.G. on weekends, sought time with her on weekdays during daycare hours, and accompanied her to events such as a father-daughter dance. The evidence also shows that throughout the separation period, Tiffany and John continued to receive help from others with V.G.'s daycare pick-ups and drop-offs and with providing a place for her to stay.

¶16. Looking at the evidence as a whole, we find the chancellor did not abuse his discretion by finding that John was the primary caregiver throughout his daughter's life, or in determining that this factor favored John.

### 3. Parenting Skills and Willingness to Provide Primary Care

¶17. In her assignment of error under this factor, Tiffany focuses on the chancellor's factual determinations and weighing of evidence to support his findings. The chancellor considered and found determinative the following evidence: Tiffany chose to spend time with another man; she interfered with John's visitation; she previously lost custody of her first child; she terminated all contact between John and B.S. due to certain text messages despite their close relationship; and she was planning to move to Huntsville or Tallahassee for job relocation. "The chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Case*, 339 So. 3d at 804 (¶16) (quoting *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003)). As such, we "cannot reweigh the evidence and must defer to the chancellor's factual findings so long as they are supported by substantial evidence." *Latham v. Latham*, 357 So. 3d 1157, 1161 (¶9)

9

(Miss. Ct. App. 2023) (quoting *Roberts v. Eads*, 235 So. 3d 1425, 1428 (¶13) (Miss. Ct. App. 2017)).

¶18. "Our supreme court has on several occasions permitted a chancellor to consider a parent's choice to spend time with a lover rather than her children." *Woodham v. Woodham*, 17 So. 3d 153, 159 (¶21) (Miss. Ct. App. 2009) (citing *Copeland v. Copeland*, 904 So. 2d 1066, 1076 (¶40) (Miss. 2004)). Tiffany argues that her time away with another man was improperly evaluated because V.G. spent more time with other family members when Tiffany was gone rather than with John. However, "[o]ther than his employment, [John] appeared to have no interests he placed above the child." *Id*. at 159 (¶20). Although "it is not the purpose of [appellate courts] to punish adultery, it is a factor to consider in awarding custody of minor children." *Mabus*, 890 So. 2d at 817-18 (¶46). The reasoning behind this rule is "that an affair 'interfere[s] with the [spouse's] ability to effectively parent, regardless of whether the children knew of it.'" *Montgomery*, 20 So. 3d at 43 (¶18).

¶19. As for Tiffany's interference with John's visitation, "[t]his Court has held that a parent's attempt to alienate a child from the other parent reflects poorly on the parent's parenting skills." *Hamby v. Hamby*, 102 So. 3d 334, 338 (¶18) (Miss. Ct. App. 2012). John testified that Tiffany attempted to instruct the daycare that he was not allowed to visit his daughter there and that she told him she was going to remove her from daycare if he continued to visit there. He further stated that the daycare director had to intervene and explain to Tiffany that he was allowed to visit the child pursuant to the temporary order. John

10

also testified that Tiffany prevented him from seeing V.G. outside of the temporary order's mandatory visitation allotment. Tiffany testified that John could have visited her if he had called, but John stated that he asked on one occasion and Tiffany denied his request. "[W]hen there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Jenkins v. Jenkins*, 307 So. 3d 473, 478 (¶17) (Miss. Ct. App. 2020) (quoting *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶34) (Miss. Ct. App. 2017)).

¶20. Tiffany further complains that the chancellor erred by considering a 2011 judgment placing her first child, B.S., in her mother Pamela's custody. Mississippi courts have repeatedly allowed the evaluation of parenting skills as it relates to the care of another child. *See Dunnam v. Dunnam*, 270 So. 3d 245, 248-49 (¶¶10-11) (Miss. Ct. App. 2018). In this case, the chancellor contemplated Tiffany's parenting of her first child in addition to her parenting of V.G. The court's order considered that Tiffany lost custody of him for approximately ten years and had only recently regained custody of B.S. in May 2021, a mere seven months before her separation from John. Importantly, the chancellor also noted Tiffany's commendable acknowledgment at trial "that she had made mistakes and her baby comes first now." Though somewhat remote in time, because our caselaw permits the court to consider her parenting related to the care of another child, we cannot find that it was manifest error for the chancellor to consider the custody decisions for B.S. in the overall

11

context of this factor.

¶21. Because he found it pertinent to the evaluation of parenting skills and willingness to provide primary care under an *Albright* analysis, the chancellor also considered Tiffany's testimony that she is trying to move to Huntsville or Tallahassee in search of a better school system and due to unspecified alleged dangers in Columbus. But the chancellor noted that Tiffany admitted that she had not actually looked into any new schools and conceded she desired to move to help her career when he found that she "appeared to be her once again putting her career before her kids." Notably, Tiffany and V.G. would have no family in these new cities which are several hours away from the family members who have played a role in providing care for the child. "The testimony and evidence concerning [Tiffany's] . . . distance from home, and lack of other family members nearby in case of emergency are uncontradicted. All of these considerations are legitimate concerns in the capacity to provide primary care." *Lee v. Lee*, 798 So. 2d 1284, 1290 (¶22) (Miss. 2001).

¶22. Tiffany's appeal takes further issue with the parenting skills factor claiming that the chancellor wrongfully disregarded evidence in the record portraying John's negative parenting skills. However, a review of the record shows that the chancellor's findings explicitly took into consideration Tiffany's testimony regarding V.G.'s clothing, physical appearance, and hygiene while under John's care. The court's order made further note of Tiffany's testimony of John's alcohol use but he concluded that there was no evidence that

12

John's alleged drinking interfered with his care of V.G.[4] Ultimately, the chancellor's decision under this factor was predicated on the fact that "that [Tiffany] did not state why her skills were better than John's." Her witnesses at trial provided some testimony that she was a good mother when present and, though she had troubles in the past, she and V.G. are now "two peas in a pod." Admirably, when Tiffany was directly asked, "is there anything else that you want the [c]ourt to know about why you should get custody rather than John," she responded, "I've made mistakes. I put my job first. I learned from that. My babies come first now, [V.G.] and [B.S.]. I just want what's best for them . . . and I think me and [V.G.] and [B.S.], as a family unit, is what's best."

¶23.    In contrast, other testimony before the chancellor demonstrated Tiffany's dependence on John to take care of the children at night and her inattention to proper clothing, shoe sizes, potty training, and diaper rash issues when she was responsible for the care of her daughter. One of the grandfathers also testified that Tiffany never called to check on V.G. on the nights she was with him but John called without fail. The chancellor pointed to the scarce testimony regarding the positive qualities of "[Tiffany's] parenting skills but [highlighted] that there was 'reliable and consistent' testimony about [John's] skills" and the positive attributes of his parenting of their daughter. *Sanders*, 281 So. 3d at 1051 (¶26). Substantial evidence

---

[4] "The chancellor acknowledged that [Tiffany's] [grand]parents expressed various concerns related to [John's] parenting skills and alleged [drunkenness]. However, the chancellor found that [Tiffany's] [grand]parents' testimony did not establish any immediate threat of harm to [V.G.] or cause the court any concern." *Sanders v. Sanders*, 281 So. 3d 1043, 1051 (¶26) (Miss. Ct. App. 2019).

supports the chancellor's finding that the factor covering parenting skills and the willingness to provide primary care favored John.

### 4. Employment and Employment Responsibilities

¶24. Tiffany claims that the chancellor erred by inferring that she may not have a job in the future and should have found this factor in her favor because she has a regular schedule and demonstrated during the temporary order that her employment does not prevent caring for V.G. "[T]his factor appears to be applied in two ways: either to prefer a parent who draws an income over one who does not, or, more often, to prefer a parent who works less or not at all and can therefore spend more time with his children." *Tedford v. Tedford*, 312 So. 3d 420, 426 (¶25) (Miss. Ct. App. 2021) (quoting *Owens v. Owens*, 950 So. 2d 202, 210 (¶26) (Miss. Ct. App. 2006)). Mississippi caselaw has "affirmed a chancellor's preference of a father who had a 'more flexible schedule' which allowed him to spend more time with his child." *Owens*, 950 So. 2d at 209 (¶24) (citing *Copeland*, 904 So. 2d at 1076 (¶42)).

¶25. Both Tiffany and John had a history of continuous employment and both were gainfully employed at the time of the trial; thus, they both drew an income. As such, the chancellor continued his evaluation to consider the flexibility of the parties' schedules. The chancellor found credible evidence that John set his own schedule and this flexibility was beneficial for his ability to care for V.G. The chancellor determined that John worked in close proximity to his home and nearby to both sides of their extended family—William and the Bakers.

14

¶26.  This is in contrast to Tiffany's plan to relocate to Huntsville or Tallahassee despite the fact that she had yet to receive a job offer for either city and thus did not submit evidence of the hours and schedule she would be working upon employment relocation. Accordingly, Tiffany's testimony about her employment was only affirmative of the fact that she did not plan on remaining at her job with the West Point Walmart and that she had not yet received a job offer with specific details to present to the chancery court. We cannot find that the chancellor was manifestly wrong in determining that Tiffany's employment and the specifics of her work-week schedule, hour requirements, proximity to home, job duties, et cetera, were uncertain for the purposes of determining V.G.'s best interest under this factor of *Albright*. Therefore, the chancellor did not abuse his discretion by finding that the child's best interests favored the parent with a flexible schedule, working near extended family, and whose employment was more permanent rather than the parent who was clear that she intended on moving and seeking a new job with unsettled prospects.

### 5.  Mental and Emotional Health

¶27.  Tiffany claims the court also erred in evaluating the evidence allegedly reflecting John's poor mental and emotional state of mind. More specifically, she claims the chancellor failed to consider or place greater weight on social media messages that she submitted as evidence with her motion for a protective order. However, this motion was filed after trial, before the chancery court rendered its judgment, and Tiffany chose not to proceed with a hearing on the motion.

¶28. "[S]imply filing the motion is insufficient. It is the movant's burden to ensure that the motion is heard, ruled upon, and an appropriate order is entered by the trial court." *Ford Motor Co. v. Tennin*, 960 So. 2d 379, 393 (¶48) (Miss. 2007). "A motion that is not ruled upon is presumed abandoned." *Cossitt v. Alfa Ins. Corp.*, 726 So. 2d 132, 135 (¶12) (Miss. 1998); *see also WBL SPO I LLC v. W. Town Bank & Tr.*, 359 So. 3d 1069, 1077 (¶36) (Miss. 2023) ("Because West Town did not obtain a ruling on its motion to amend, that motion is deemed abandoned and is not eligible for appellate review."). Tiffany did not obtain a ruling from the chancery court on her motion for a protective order against John. As a result, her motion is deemed abandoned and waived. Therefore, the motion and its evidentiary contents, including any alleged social media messages, are not eligible for appellate review. Based on a review of the record, there is substantial evidence to support the chancellor's determination that this factor is neutral.

### 6. Moral Fitness of the Parents

¶29. Tiffany claims that this factor should have been deemed neutral asserting that no evidence was presented of any adverse effect caused by her extramarital affair or that she ever left V.G. without competent care. "Adultery of a parent may be an unwholesome influence and an impairment to the child's best interest[.]" *Denham v. Denham*, 351 So. 3d 954, 963 (¶18) (Miss. 2022). As such, "[a]dultery should be considered in evaluating moral fitness, but it should not be given undue weight." *Blakely*, 88 So. 3d at 804-05 (¶26). As previously discussed, the chancellor considered the fact that Tiffany's extramarital affair

16

caused her to be away for a substantial number of nights. The chancellor found that it was undisputed she left V.G. with John, William, or the Bakers on numerous occasions to pursue this relationship. The chancellor's findings on this issue are supported by the evidence and do not amount to a sanction against Tiffany for her adultery.

### 7. Home, School, and Community Records

¶30. Tiffany also asserts that the home, school, and community records should have been deemed a neutral factor because the chancellor relied on two issues she believes do not favor either party—John's church attendance and her potential move. In support of her position on appeal, she highlights only a portion of the relevant evidence submitted at trial, including that they did not go to church often while married, John only began attending church more regularly after the separation, and John previously indicated to her that he was an atheist. She further argued that her admitted plan to relocate should not be held against her because the specifics of it require speculation at this juncture.

¶31. In evaluating part of this factor, our "supreme court has affirmed that a chancellor may consider the issue of religion when determining custody." *Davidson v. Coit*, 899 So. 2d 904, 911 (¶22) (Miss. Ct. App. 2005) (quoting *Weigand v. Houghton*, 730 So. 2d 581, 587 (¶23) (Miss. 1999)). Evidence has previously been considered to weigh in favor of a parent, such as "a father[,] who took his child to church." *Montgomery*, 20 So. 3d at 46 (¶34) (citing *Pacheco v. Pacheco*, 770 So. 2d 1007, 1010-11 (¶17) (Miss. Ct. App. 2000)). Diving deeper into this factor, this Court has long acknowledged that "the supreme court has considered it

17

a valid exercise of a chancellor's discretion to consider that a child has more friends and relatives in a particular location when determining the custody of a child." *S.B. v. L.W.*, 793 So. 2d 656, 659-60 (¶17) (Miss. Ct. App. 2001).

¶32.    After reviewing the evidence as a whole, the chancellor noted that John has been taking V.G. to the same church for years and that Tiffany stated she "does not attend church now, as I don't feel it is required." Further, this was not the only basis for the chancellor's ultimate ruling on this factor, as he also concluded that John plans to remain near V.G.'s family and friends while Tiffany plans to move to a different state were persuasive. We find sufficient evidence was presented to support the chancellor's decision to weigh this factor in John's favor.

###    8.    Stability of the Home Environment

¶33.    As part of her appeal, Tiffany asserts that the chancellor erred by finding the home stability factor in John's favor because he has not had his own home since the time of the their separation and planned to move in with his father upon the parties' divorce. Tiffany claims that this factor should weigh in her favor instead because the mortgage for the marital home was solely in her name, was paid from her account, and she was granted the home in the temporary order and paid all the related bills.[5]

¶34.    "When weighing the stability of the home environment, our courts have considered

---

[5] It is also noteworthy that as part of the divorce judgment, the parties have been ordered to sell the marital residence which forms a large basis for Tiffany's claim of a more stable home environment.

numerous factors which contribute to a favorable home environment." *Montgomery*, 20 So. 3d at 46 (¶34). This Court has found "[p]arents with extended family nearby have been favored[.]" *Id*. The record reveals that trial testimony showed V.G. had lived with Tiffany and John around the Columbus area for the majority of her life. The child had a close relationship with members of her extended family, including John's father and Tiffany's grandparents, and she regularly spent time with them. The record reflects that these family members live in and around Columbus, within close proximity to her. The evidence shows V.G. does not have any extended family in the area of Huntsville or Tallahassee. In finding that this factor favored John, he noted John's intention to remain in the area and the lack of clarity as to Tiffany's planned relocation.[6]

¶35.    Moreover, it is important to note that "[John's] living arrangements (i.e. [living with a friend and/or his father]) were in response to losing the marital home to [Tiffany] in the [temporary order.] . . . It is unfair to ask a man to leave his home then use that factor to also deny him custody of his child." *Lee*, 798 So. 2d at 1291 (¶28). V.G. had her own room at her grandfather's house when she would stay with him for John's visitation during the pendency of the divorce proceedings. We cannot find the chancellor erred in his determination finding this factor favored John.

    **9.    Other Factors Relevant to the Parent-Child Relationship**

_____

[6] The court's order indicated the chancellor also took into consideration that after the marital residence is sold, John intends to build a house with his father on land near the marital residence.

19

¶36.    Lastly, Tiffany argues that the chancellor's order should be reversed to prevent the continued separation of V.G. and her half-brother B.S. because there is no unusual and compelling interest to separate the siblings in this matter. Tiffany claims that due to living together for approximately one-third of V.G.'s life and regular visitation between the two siblings even before B.S. moved in with them, they had established a strong bond. However, in his order granting custody, though the chancellor noted that there is a "strong preference for keeping siblings together, and that applies to half-siblings," he was also mindful that the preference "should not 'override' the best interests of the children." *See Owens*, 950 So. 2d at 207 (¶¶11-12). He found that even though they are siblings, Tiffany has only had custody of B.S. since 2021, therefore V.G. has not lived with him for the majority of her life. Thus, the chancellor held this factor only slightly in Tiffany's favor.

¶37.    The issue of siblings in a custody determination is a question that the chancellor may consider as part of the *Albright* analysis, though the separation of siblings is not its own *Albright* factor. *See Dunnam*, 270 So. 3d at 250 (¶19). We acknowledge "[t]here is a preference for keeping siblings together, but the paramount concern is the best interest of the child." *Hackler v. Hackler*, 296 So. 3d 773, 779 (¶39) (Miss. Ct. App. 2020) (quoting *Davis v. Stevens*, 85 So. 3d 943, 951 (¶35) (Miss. Ct. App. 2012)). Importantly, "[t]here is no 'hard and fast' rule that the best interest of siblings will be served by keeping them together." *Copeland*, 904 So. 2d at 1076 (¶43) (quoting *Sellers v. Sellers*, 638 So. 2d 481, 484 (Miss. 1994)).

¶38. Here, the chancellor clearly and articulately considered the fact that granting John custody of his daughter would result in the half-siblings no longer residing together. There is ample evidence in the record to support his finding that it only weighed slightly in Tiffany's favor and did not outweigh the totality of the other factors considered by the chancellor in awarding custody of V.G. to her father.

## CONCLUSION

¶39. After a thorough and clear analysis, the chancellor determined that the child's interests were best served by being placed in John's custody. We find it apparent from the record that there is substantial credible evidence to support the chancellor's custody determination. Abiding by our standard of review, this Court affirms the chancery court's order granting physical custody to John.

¶40. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**